EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| In re: | |
|---|---|
| | 2017 TSPR 64 |
| Hon. César Mercado Santaella Juez Superior | 197 DPR _____ |

Número del Caso: AD-2014-7
             AD-2015-4


Fecha: 26 de abril de 2017


Abogado de la Parte Querellada:


        Lcdo. Harry Padilla Martínez


Oficina de Administración de los Tribunales
Oficina de Asuntos Legales

        Lcda. Cristina Guerra Cáceres, Directora
        Lcda. Rosa Cruz Niemiec
        Lcda. Valerie Díaz Aponte

Comisión de Disciplina Judicial:

        Hon. Aída N. Molinary de la Cruz, Presidenta
        Lcda. Delia Lugo Bougal
        Lcdo. José L. Miranda de Hostos
        Dr. Juan Salgado Morales


Materia: Disciplina Judicial - Destitución inmediata de Juez Superior por quebrantar los Cánones 2, 4, 8, 20, 23, 28 y 30 de Ética Judicial, 4 LPRA Ap. IV-B.


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

|  |  |
|---|---|
| In re:<br><br>Hon. César Mercado Santaella<br>Juez Superior | **Núm.** AD-2014-7<br>AD-2015-4 |

*PER CURIAM*

En San Juan, Puerto Rico, a 26 de abril de 2017.

Hoy nos corresponde evaluar dos querellas presentadas contra el juez César Mercado Santaella por múltiples actuaciones susceptibles de sanción disciplinaria que quebrantan los *Cánones de Ética Judicial*, en particular los Cánones 2, 4, 8, 20, 23, 28 y 30. Esperamos que los pronunciamientos que hoy emitimos calen hondo en los miembros de la judicatura para que no se repitan controversias, fácilmente evitables, que desprestigian el estrado y la justicia que desde ahí se imparte.

## I.

César Mercado Santaella fue nombrado Juez Superior del Tribunal de Primera Instancia el 1 de diciembre de 2009. Tras varios años de labor judicial, la Oficina de Administración de los Tribunales (OAT) presentó dos querellas contra el juez Mercado Santaella ante la Comisión de Disciplina Judicial (Comisión).

Los hechos a relatarse fueron objeto de investigación por la OAT a solicitud de su propia directora y por motivo

de una queja presentada por el Sr. Giovanni Perlloni. De ahí surgieron dos informes referidos a la atención de la Comisión de Disciplina Judicial, que halló causa probable para iniciar un trámite disciplinario contra el juez Mercado Santaella por infracción a las Cánones 2, 4, 8, 19, 20, 23, 24, 28 y 30.[1] Por esa razón, la OAT presentó las querellas AD-2014-7 y AD-2015-4, cuya consolidación la Comisión luego autorizó por estar relacionadas.

Así, en la primera querella, de número AD-2014-7, contra el juez Mercado Santaella, la OAT le imputó al querellado los siguientes cargos: (1) socavar la confianza y el respeto en la Rama Judicial mediante la publicación de mensajes en Facebook, en violación a los Cánones 2, 8, 19, 23 y 24, (2) incumplir con su deber de comportarse ejemplarmente en su vida profesional y privada al colocar mensajes en *Facebook*, en violación a los Cánones 2, 8, 19, 23, 24 y 28, (3) influir indebidamente a otra juzgadora mediante su testimonio sobre las fotografías que tomó relativas al litigio de su sobrina, en violación a los Cánones 23 y 30, (4) no inhibirse en el procedimiento criminal contra el señor Perlloni, en violación a los Cánones 2, 8, 20 y 23 y (5) registrar manualmente como trabajado un periodo no trabajado en incumplimiento de normas reglamentarias, en violación a los Cánones 4 y 23.

---

[1] Así lo determinaron dos comisionados distintos al considerar dos informes presentados por separado a la Comisión de Disciplina Judicial.

Por otro lado, en la segunda querella, AD-2015-4, consolidada con la AD-2014-7, la OAT le imputó (1) enviar correos electrónicos que socavaron la confianza y el respeto en la Rama Judicial, en violación a los Cánones 2, 4 y 23, y (2) enviar correos electrónicos que constituyeron un uso inadecuado de la propiedad de la Rama Judicial y reflejar características contrarias a las que debe exigir un juez, en violación a los Cánones 2, 4 y 23.

## A.    Mensajes y expresiones en *Facebook*

El juez Mercado Santaella cuenta con una página en la red social *Facebook* que lleva por nombre "El César" y tiene una foto de perfil del Juez. Éste sostiene que su hijo le creó la página y que a veces también publicaba en ella. La página estaba configurada como una pública al momento en que los comentarios que aquí consideraremos fueron referidos a la Oficina de Asuntos Legales de la OAT. Esto implica que cualquier persona podía acceder a su contenido sin necesariamente ser amigo del Juez en la red social.

Entre enero de 2012 y marzo de 2014 el Juez escribió los siguientes mensajes en su página:

1.    "En la asamblea extraordinaria de la Asociación de Miembros de la Judicatura, para ver cómo atacamos este atropello. Parece mentira que la legislatura trate de ignorar y violar la Constitución que juraron defender contra todo enemigo interno o eterno. ¿No será que ellos mismos son el enemigo?"

2.    "Me gustaría que todos los colegas que me aprecian asistieran a la actividad de mi

ídolo/hermano y colega Mark Bimbela, próximo presidente del Colegio de Abogados, ya que voy a estar en California con mi hija enferma. Mark va a volver a hacer que sintamos que el Colegio es nuestro. DE TODOS, sin barres [sic] políticas separándonos".

3. "La secretaria modelo o la modelo secretaria?"[2]

4. "Los que me conocen bien saben todo lo pro-mujer que soy, pero aún así no deja de impactarme por su exactitud un comentario de mi compadre: 'La mujer es como el dinero, hoy es tuyo, mañana de otro y pasado y de otro más'".

5. "Sé que dije que me iba de Facebook por un tiempo, pero tengo que entrar para dedicarle esta joya de canción al Agente Jose Meléndez, el del famoso video del sexo oral. Eres el paradigma de lo que es ser poco hombre. Te mereces que ninguna mujer que se valore te mire. Por desgracias (pq eres una desgracia en dos patas) como tú es que las mujeres piensan mal de todos nosotros. Eres una vergüenza hasta para las ratas como tú. El Karma no es una venganza de Dios, sino el reflejo de muestras [sic] acciones. Tatiana tendrá el suyo y se sentar a [sic] la puerta de su casa a ver pasar tu entierro. Ojalá la vida te lo cobre a ti y no a tu madre, hermanas o hijas, que ni tienen la culpa de que tú seas el hp que eres".[3]

6. "Comiendo sándwich de bistec y bebiendo champagne en Kasalta ¡Qué mal me va!". Este mensaje luego incluye unos comentarios de amigos del Juez Mercado Santaella en Facebook, a los que el Juez les responde diciendo: "Bueeeno, ya se fue la primera botella, que era Moet Chandon Imperial Brut. Por ahí debe venir la segunda, Laurent Perrier Brut… Bieeeen frío. Me

---

[2] Este mensaje fue compartido junto a una foto de la secretaria del Juez Mercado Santaella.

[3] El mensaje está acompañado de un enlace en YouTube.com a la canción "Rata de dos patas" de la cantante mexicana Paquita la del Barrio.

sigue yendo mal". Así también, luego añade el Juez: "Calma, César, calma, que el champagne también emborracha. Y si te agarra un policía no puedes llamar al Secretario".

7. "Sé que hace uno dias [sic] dije que no entraria [sic] aquí por varios meses, pero no puedo obviar la necesidad de hacer este comentario: Stephanie, haz [sic] elevado el capoteo a niveles insospechados. El problema lo tienen ahora las nenas. ¡Chicas, hay que superar eso! Yo sé que pueden, así que adelante. Los varones [s]eremos jueces justos (y estamos esperando por ustedes)".

8. "La verdad es que todavía no aprendemos. La hija de un amigo acepta una invitación de un individuo que la pretende hace menos de dos meses. Despiden el año en un hotel, ella se toma una copa de champaña barata demás [sic], el tipo va a llevarla al apt de ella, se aprovecha, y se queda con ella, que ahora está embarazada y el muy tráfala ahora está desaparecido y no le contesta las llamadas. Ruego pq la única consecuencia sea el embarazo y no le haya dejado algo más, como una ETS. Hay cada HP entre nosotros!!!".

9. "Eso no es pitorro, ¿verdad que no? ¿Verdad que no está rico nada?".[4]

10. "En la playa, mirando al mar desde mi balcón y con cierto néctar gélido en mi mano (Michelob bieeen fría). Hace un día precioso en Río Grande. Y yo Extrañando a la mujer que amo, que no puede estar aquí conmigo".

Así también, en ese mismo periodo de tiempo, el Juez compartió desde su cuenta múltiples imágenes provenientes de otras páginas de *Facebook*, las cuales contenían expresiones como las siguientes:

---

[4] El mensaje está acompañado de una imagen en la que aparece el Juez Mercado Santaella con un vaso en su mano.

11. "Es mejor que un amigo me diga HIJO DE TU PUTA MADRE que un HIJO SE [sic] SU PUTA MADRE me diga AMIGO".

12. "Querido Dios: Este año te llevaste a mi actor favorito Paul Walker, a mi humorista favorito Alvarez Guedes, a mi actriz española favorita Sara Montiel, a mi persona favorita Nelson Mandela… Y no te reprocho nada, solo quiero que sepas que mi Gobernador favorito es Alejando García Padilla, mi Senador favorito es Eduardo Bhatia y aun no se acaba el año…".

13. "Llevo Tanto Tiempo Sin Sexo que Pensé que FORNICAR era una Empresa de Carros".

14. "HAY GENTE PENDEJA PERO TÚ ERES MEDALLA DE ORO".

15. "YO NO PIDO QUE ME AMEN. CON QUE NO ME JODAN ES SUFICIENTE".

16. "Esas jodidas ganas de querer abrazarte, besarte, de acurrucarme contigo, de acariciarte. Me mata no tenerte aquí, a mi lado".

17. "En 1990 dracula [sic] se alimentaba de vírgenes. En el 2013 murió de hambre".

18. "Yo también lloré, sin saber que la vida me estaba haciendo un PUTO FAVOR".

19. "Damas, como evitar el ser filmadas durante sexo oral: 1. Si siente o ve la luz potente y brillante de un teléfono inteligente en su cara, deje de succionar el miembro inmediatamente. 2. Si le susurran: 'te estoy grabando'. Saque el miembro inmediatamente de su boca. 3. Verifique el [á]rea en el cual se lleva acabo [sic] el acto pueden haber c[á]maras escondidas. 4. Simplemente no sea pendeja y chúpelo en privacidad o b[ú]squese a un hombre que no necesite una peliculita para acordarse de usted. Caballeros, c[ó]mo evitar ser filmado durante sexo oral: 1. Enjoc[í]quese y haga un buen trabajo para que vea c[ó]mo ella no podrá sostener la cámara".

20. "Soy la más experta!!! Se lo chup[é] a un sargento en un cuartel . . . Párame la

pendejá!!! Yo se lo chupé a un presidente en la casa blanca!!".[5]

21. "NUNCA LLAMES PUTA a una mujer por tener sexo porque me imagino que tu mam[á] no te hizo dibujando".

22. "No hablo japonés pero, hasta yo sé lo que significa!".[6]

23. "No es lo mismo estar dormido que estar durmiendo, porque no es lo mismo, estar jodido que estar jodiendo".

24. "Sobre un gobierno sin excusas – te mentí. Sobre el tema de retiro -  te mentí. Sobre bajar luz y agua – te mentí. Sobre crear 50 mil empleos en 6 meses – te mentí. Sobre eliminar el IVU – te mentí. Cuando dije que primero la gente – TE MENTÍ!. A.G.P."[7]

Por último, cabe resaltar que en sus comentarios en algunas de las publicaciones aquí reseñadas, los amigos o seguidores del perfil de *Facebook* del juez Mercado Santaella se referían a él como "juez" u "honorable".

## B. Intervención particular del juez Mercado Santaella en *Mercado Rodríguez v. Perlloni Figueroa*

De otra parte, surge a su vez de las estipulaciones de hechos entre las partes que el juez Mercado Santaella tiene una sobrina, la Sra. Sandra Vanessa Mercado, que para los años 2010 y 2011 litigaba un pleito de revisión de pensión alimentaria contra su ex esposo, el Sr.

---

[5] La primera parte de la cita tiene como fondo la imagen de una dama, mientras la segunda parte tiene como fondo la imagen de la Sra. Mónica Lewinsky.

[6] El mensaje está acompañado de un dibujo que, si bien puede confundirse con letras extranjeras, a la vez es sugestivo de una posición sexual.

[7] El mensaje tiene como trasfondo una fotografía del ex Gobernador, Hon. Alejandro García Padilla.

Giovanni Perlloni.[8] Una de las controversias en dicho litigio giraba en torno a una villa en alegada posesión del señor Perlloni, cuya titularidad la señora Mercado quería probar pues la consideraba pertinente a los efectos de la revisión de la pensión.[9] Según la señora Mercado, el señor Perlloni evadió informar sobre la adquisición de la villa sita en la República Dominicana, pues éste pretendía excluir dicha propiedad del cómputo de la pensión de los menores de edad.

Así las cosas, la representante legal de la señora Mercado, la Lcda. Ana López Prieto, quien sostiene una relación de amistad con el juez Mercado Santaella de más de diez años, le escribió a este último un correo electrónico en el que le preguntó si iría a la República Dominica, lugar en que se encontraba la villa del señor Perlloni. En específico, el mensaje lee así:

> Hola César: Tuviste la oportunidad de hablar con tu amigo? Salgo A New York el 19 de noviembre y me gustaría resolver el asunto antes de esa fecha. Ya sabes si vas a República? Déjame saber porque la reunión en mi oficina es el 29 de noviembre y tengo que entregar toda mi prueba en esa fecha, por lo que debo entregar las fotos del sitio en Punta Cana.[10]

En atención a ello, el 9 de diciembre de 2010 el juez Mercado Santaella viajó a la República Dominicana y tomó

---

[8] Según reluce del expediente, la relación habida entre el Juez Mercado Santaella y la señora Mercado Rodríguez es muy cercana, pues él fungió como figura paterna de ésta.

[9] *Apéndice*, Querella AD-2014-7, Anejo 5, págs. 351-52.

[10] *Evidencia documental estipulada entre ambas partes*, Exhibit 1.

veintiún fotos de la propiedad del señor Perlloni. Para acceder a la propiedad, éste indicó que estaba interesado en comprar la villa, a pesar de que no le informó al señor Perlloni sobre su oferta de compraventa. Unos días después, el Juez recibió de la licenciada López Prieto un segundo mensaje diciendo:

> Salve Cesar. Me gustaría que le enviaras un correo a la abogada de Rep[ú]blica Dominicana para ver si se permite all[á] que levante el acta notarial y la copia certificada pueda homologarla en la embajada americana. Adem[á]s me debes decir cu[á]nto son los sellos de dicha acta. Entiendo que tendr[é] que enmendar el Acta de Conferencia que se radic[ó] si el #!!##!!!! Juez no le elimina las alegaciones. El número del caso de Sandra es E DI 2009-0324 sala 613. Por [ú]ltimo me [p]arece que ese juez tiene un pulgar realmente peque[ñ]o…[11]

Finalmente, la vista fue pautada para el 20 de junio de 2011 en el Tribunal de Primera Instancia, Sala de Caguas. Debido a ello, el 2 de junio de 2011 se expidió la citación mediante la cual se requirió al juez Mercado Santaella comparecer como testigo de la señora Mercado Rodríguez. Durante la vista, la licenciada López Prieto indicó que presentaría a un testigo, "el Honorable juez Mercado Santaella". La Examinadora de Pensiones Alimentarias (EPA), la Lcda. Luz Idalia Cruz Rodríguez, preguntó para qué era traído a la silla testifical el "compañero Juez" y si era necesario que éste testificara.[12] A preguntas de la EPA, la licenciada López Prieto indicó

---

[11] *Evidencia documental estipulada entre ambas partes*, Exhibit 2.

[12] *Apéndice*, Querella AD-2014-7, Anejo 6 (grabación).

que el juez Mercado Santaella testificaría sobre las fotografías que tomó a la alegada villa propiedad del señor Perlloni, por lo que su testimonio era necesario para autenticarlas.

Así pues, durante el interrogatorio, el juez Mercado Santaella indicó que visitó el apartamento del señor Perlloni y otras propiedades, puesto que se hallaba gestionando la compraventa de una propiedad cerca del mar, fuese en la República Dominicana o en Puerto Rico. Puntualizó que inicialmente fue un amigo fiscal quien le recomendó visitar el proyecto de vivienda y comercio Cap Cana en la República Dominicana.

No obstante, en el contrainterrogatorio, relució que el juez Mercado Santaella sabía que el ex esposo de su sobrina tenía una propiedad en Cap Cana, pero indicó que desconocía que el apartamento fotografiado era, específicamente, del señor Perlloni. Mediante una declaración jurada, el juez Mercado Santaella insistió que en ningún momento hizo trabajo investigativo para beneficio de su sobrina, sino que fotografió todas las propiedades que visitó en Cap Cana con el único propósito de mostrárselas a su esposa quien no lo pudo acompañar en el viaje. Éste reconoció haber comparecido a prestar testimonio en el pleito de su sobrina; sin embargo, consideró que al hacerlo meramente cumplía con una citación oficial del Tribunal.

## C. Registro de horas laboradas en el sistema de asistencia Kronos

Con relación a las fotos que tomó el Juez de la villa del señor Perlloni el 9 de diciembre de 2010, surge de Kronos —el sistema electrónico de asistencia de la Rama Judicial— que el Juez registró ese día como uno trabajado. Es decir, según una entrada manual registrada en Kronos el 17 diciembre de 2010, el Juez se reportó a trabajar el 9 de diciembre de 2010, de 8:30am a 5:00pm. Sin embargo, por propia estipulación del Juez, ese día se encontraba en la República Dominicana, pues fue allí que tomó las fotos que luego autenticó en la vista a la que fue citado con relación al pleito de su sobrina. Por otro lado, el 20 de junio de 2011, el juez Mercado Santaella registró manualmente una asistencia de 8:30am a 5:00pm. Empero, ese día, el Juez se encontraba testificando en la vista sobre revisión de pensión alimentaria de su sobrina.

Ahora bien, el Sistema KRONOS, tanto para la fecha de 9 de diciembre de 2010 como para la fecha de 20 de junio de 2011, refleja que el registro de tiempo trabajado fue realizado de modo manual.[13] Asimismo, tenemos ante nos una certificación de la Directora de Oficina de Servicios y de Apoyo a Jueces que documenta que para las referidas fechas, no aparecen comentarios del juez Mercado Santaella que aclaren lo sucedido o que cargara dichos periodos de

---

[13] *Apéndice*, Querella AD-2014-7, Anejo 16, págs. 651-52.

tiempo a licencia alguna.[14] Obra también en el expediente una certificación de la Secretaria Regional de Guayama en la que informa que el 9 de diciembre de 2010 el juez Mercado Santaella presidió la Sala del Tribunal de Primera Instancia en Salinas en horas de la mañana, en particular desde las 9:51am hasta las 11:36am. Igualmente, la certificación demuestra que el 20 de junio de 2011, el juez Mercado Santaella no presidió su Sala en el Tribunal de Primera Instancia en Cayey.[15]

**D. Intervención como Juez en *Pueblo de Puerto Rico v. Giovanni Perlloni***

Para finales de 2012, el señor Perlloni, ex esposo de la sobrina del juez Mercado Santaella, enfrentaba una acusación criminal. Véase *Pueblo de Puerto Rico v. Giovanni Perlloni*, Núm. D LE2012G0829. Como parte de dicho procedimiento, el juez Mercado Santaella atendió una *Moción informativa y solicitud de permiso* presentada por el señor Perlloni el 5 de diciembre de 2012 en la que, debido a que se encontraba bajo la supervisión de la Oficina con Antelación a Juicio, solicitaba permiso para asistir a unas actividades en el período navideño.[16] El juez Mercado Santaella proveyó *ha lugar* a la moción mediante orden dictada el 20 diciembre de 2012.[17]

---

[14] *Apéndice*, Querella AD-2014-7, Anejo 16, pág. 650.

[15] *Apéndice*, Querella AD-2014-7, Anejo 15, pág. 649.

[16] *Apéndice*, Querella AD-2014-7, Anejo 8, págs. 573-74.

[17] *Apéndice*, Querella AD-2014-7, Anejo 8, págs. 567-70.

Además, el 22 de julio de 2012, el juez Mercado Santaella presidió una vista en la que se debía celebrar la conferencia con antelación a juicio. No obstante, el señor Perlloni no se encontraba procesable, por lo que el Juez ordenó una evaluación del acusado, pautó una vista de procesabilidad para el 9 de septiembre de 2012 y pospuso además la conferencia con antelación a juicio para la misma fecha.[18] El Juez dispuso además que dichos procedimientos se celebrarían en la Sala 602.[19] La necesidad de esta vista resulta cuestionable dado que otro juez ya había atendido los mismos asuntos y dictado las mismas órdenes el mismo día, antes que el juez Mercado Santaella.[20]

**E. Correos electrónicos desde su cuenta oficial**

El juez Mercado Santaella manejaba un correo electrónico oficial provisto por la Rama Judicial. Al iniciar sus labores, el Juez recibió un documento titulado *Certificación del (de la) Usuario(a) para Usar los Equipos Tecnológicos y los Accesos a los Sistemas de la Rama Judicial.* El 2 de diciembre de 2009, al firmar dicho documento, el Juez certificó haber leído las normas

---

[18] *Evidencia documental estipulada entre ambas partes*, Exhibit 36.

[19] El Juez, por su parte, presidía la 603.

[20] *Evidencia documental estipulada entre ambas partes*, Exhibit 36.

aplicables a los usuarios de estos servicios y se comprometió a cumplirlas.[21]

Ahora bien, entre octubre de 2010 y mayo de 2011, este reenvió desde su cuenta correos electrónicos recibidos que incluían mensajes como los siguientes:

1.  "El pene de un hombre medio tiene tres veces el tamaño de su dedo pulgar".[22]

2.  "It all started with an iPhone… March was when my son celebrated his 15th birthday, and I got him an iPhone. He just loved it. Who wouldn't? I celebrated my birthday in July, and my wife made me very happy when she bought me an iPad. My daughter's birthday was in August so I got her an iPod Touch. My wife celebrated her birthday in September so I got her an iRon. It was around then, that the fight started… What my wife failed to recognize is that the iRon can be integrated into the home network with the iWash, iCook and iClean. This inevitably activates the iNag reminder service. I should be out of the hospital by Thursday".[23]

---

[21] *Apéndice*, Querella AD-2015-4, Anejo XXVIII, págs. 197-200. Las *Normas y Procedimientos para el Uso de Equipos Tecnológicos y Acceso a los Servicios que se ofrecen a través de la Red de la Rama Judicial* disponen, entre otras cosas, que los equipos "sólo podrán utilizarse para asuntos oficiales" y "para propósitos lícitos, responsables y dentro de las funciones inherentes a la Rama Judicial". *Evidencia documental estipulada entre ambas partes*, Exhibit 14, pág. 16. Además, disponen que "[n]o se utilizarán los equipos tecnológicos de la Rama . . . para enviar, recibir o crear mensajes o documentos de contenido discriminatorio por razones de raza, género, credo, ideas políticas u origen social o nacional o que puedan catalogarse como hostigamiento sexual". *Id.* en la pág. 18.

[22] Este mensaje está acompañado de una imagen y forma parte de un correo con múltiples imágenes titulado "Curiosidades del Cuerpo". *Apéndice*, Querella AD-2015-4, Anejo I, págs. 1-13.

[23] Este correo se titula "IPHONEIPHONE" e incluye varias imágenes. *Apéndice*, Querella AD-2015-4, Anejo II, págs. 14-17.

3.  "Diego, joven y empeñoso abogado, sabía que heredaría una fortuna cuando su padre enfermo muriese. Pe[n]sando en que también quedaría sólo decidió que precisaba una mujer acorde a su autovaloración y para hacer de ella su gran compañera. En base a su decisión, esa noche fue al bar de la ciudad, donde se juntaba lo más granado del foro local. Se fijó en una colega, la más bonita que jamás había visto. Su belleza natural era la admiración de todos los concurrentes. [É]l se arrimó y le dijo: 'Puedo parecer un abogado común, pero en pocos meses mi padre va a morir y heredaré 20 millones de dólares. ¿Quieres acompañarme y venir conmigo a casa?… Puedes llegar a ser mujer'. Impresionada la hermosa y brillante abogada, aquella noche fue a la casa con Diego… Y… tres días después se transformó en su madastra. MORALEJA: Los abogados pueden ser muy hábiles, pero las abogadas, además, son mujeres".[24]

4.  "!QUE JODIENDA..! ADEM[Á]S DE NEGRO, DOMINICANO, DISCAPACITADO, PUTO, DROGADICTO, SERO [sic] POSITIVO, CALVO, HU[É]RFANO, MUDO, MANCO Y CARDIACO, VIVO EN LLOR[É]NS??? EN ESE MOMENTO SE ME ACERCA MI NOVIO PAPO, QUIEN CON L[Á]GRIMAS RECORRI[É]NDOLE EL ROSTRO ME DICE CON VOZ AGUDA Y QUEBRADA: 'CARIÑO, NO TE PREOCUPES… VER[Á]S QUE, FORTUÑO, RIVERA SH[C]ATZ, PACO DACO, EL CHUCHIN O JENNIFER GONZ[Á]LEZ NOS VAN A SACAR DE POBRES…' ¡¡ME CAGO EN MI MADRE…!!! ¡¿TAMBI[É]N SOY PENEPÉ?!".[25]

5.  "IMPORTANTE: TODO AQU[É]L QUE RECIBA LA PRESENTE COMUNICACIÓN, TIENE LA OBLIGACIÓN, EN DEFENSA DE LA ÉTICA y DE LA DEMOCRACIA A RETRANSMITIRLO A 10 PERSONAS COMO MÍNIMO.

---

[24] Este correo se titula "Abogado y abogada". *Apéndice*, Querella AD-2015-4, Anejo IV, pág. 20.

[25] Este correo se titula "LOL!!!!!! Pesadilla Puertorriqueña Real (UNCLASSIFIED)" y cuenta una historia más extensa previa a la cita incluida sobre una persona que se percata que posee características que su narrador considera indeseables. *Apéndice*, Querella AD-2015-4, Anejo VIII, págs. 43-45.

DE NO CONTINUAR LA CADENA, Fortuño PODRÍA SER REELEGIDO GOBERNADOR. Yo, ya cumplí".[26]

6. "Le preguntan a Maripily… Pregunta: Maripily, ¿qué opinas de que Gadafi deje a Libia? A mí me parece muy bueno, claro está, siempre y cuando que no tengan hijos pequeños, es mejor que se divorcien".[27]

7. "Bebe, come y jode, que parece que lo que mata es hablar inglés!!!".[28]

8. "QUI[É]N ES?: esta es solo una simple pregunta, pero recuerda que cada vez que una mujer te pregunta 'qui[é]n es' en realidad te est[á] preguntando: QUI[É]N ES ESA PUTA Y QU[É] ES LO QUE QUIERE CONTIGO????!!!!!!".[29]

9. "Las flaquitas que desfilan en las pasarelas, siguen la tendencia diseñada por modistos, que dicho sea de paso, son TODOS GAYS, y compiten con ellas. Sus modas, son lisa y llanamente agresiones al cuerpo que no les atrae"; "No hay belleza más irresistible en la mujer que la FEMINIDAD Y LA DULZURA. La elegancia y el buen trato, son equivalentes a mil viagras"; "El maquillaje se inventó para que las mujeres

---

[26] Este correo se titula "FORTUNO entre el Cielo y el Infierno" y cuenta la historia del fallecimiento hipotético del ex gobernador Luis Fortuño, ante el cual "Dios y el Diablo se pelean porque ninguno de los dos lo quiere recibir". *Apéndice*, Querella AD-2015-4, Anejo X, págs. 48-51.

[27] Este correo se titula "Le preguntan a Maripily" y continúa narrando una supuesta entrevista a la modelo Maripily con alrededor de diez preguntas. *Apéndice*, Querella AD-2015-4, Anejo XII, págs. 55-56.

[28] Este correo se titula "CONCLUSION CIENT[Í]FICA" y hace unas supuestas comparaciones empíricas sobre las preferencias en comida, bebida y actividad sexual en distintos países. *Apéndice*, Querella AD-2015-4, Anejo XIV, págs. 77-85.

[29] Este correo se titula "LAS PALABRAS 10 PALABRAS mas [sic] peligrosas USADAS POR LAS MUJERES!!!". "Quién es" es la última palabra o frase en la lista de diez que menciona el correo. *Apéndice*, Querella AD-2015-4, Anejo XVI, págs. 95-97.

lo usen. Úsenlo. PARA ANDAR CON LA CARA LAVADA ESTAMOS NOSOTROS".[30]

10. "Mi amigo, si usted piensa que la mujer es demasiado costosa, vuélvase GAY. ¡Sólo tiene mujer quien puede!".[31]

El juez Mercado Santaella reenvió estos correos electrónicos desde su cuenta oficial de la Rama Judicial tanto a personal de la Rama Judicial como a terceros. Así las cosas, al advenir en conocimiento de la situación, la entonces Directora Administrativa de los Tribunales, la Lcda. Sonia I. Vélez Colón, le suspendió el uso del correo electrónico al Juez y lo citó a fin de proveerle orientación. El juez Mercado Santaella alega que durante la reunión, la Directora lo amonestó verbalmente por el uso indebido del correo electrónico, luego de lo cual ordenó el restablecimiento del servicio en cuestión.

**II.**

**A.**

El advenimiento de las redes sociales presenta para los jueces oportunidades y retos en igual medida. Oportunidades, porque es importante que los jueces se relacionen con la comunidad a la cual sirven, de manera

---

[30] Este correo se envió bajo el título "SaludosSaludos" e incluye un anejo titulado "paratodaslasmujeres". El anejo es una presentación de múltiples mensajes con descripciones y recomendaciones de su autor original en torno a las mujeres. *Apéndice*, Querella AD-2015-4, Anejo XVIII, págs. 102-19.

[31] Este correo se titula "solo para los verdaderos hombressolo [sic] para los verdaderos hombres" e incluye una serie de recomendaciones sobre el trato a las mujeres. *Apéndice*, Querella AD-2015-4, Anejo XXII, págs. 175-78.

que no sean ciegos "a las fuerzas que dan forma a la opinión pública". Oficina de las Naciones Unidas contra la Droga y el Delito, *Comentario relativo a los Principios de Bangalore sobre la conducta judicial* 39 (2013). Ello, pues "[e]l esclarecimiento judicial de los hechos, parte importante de la labor de un juez, exige la evaluación de la prueba a la luz del sentido común y de la experiencia". *Id*. En ese sentido, las redes sociales y el internet se han convertido en espacios de interacción social de suma importancia, de cuyo conocimiento puede nutrirse el juez. Y riesgos, porque la novedad de foros como *Facebook*, *Twitter* y *LinkedIn*, entre otros, con sus respectivas políticas de privacidad y permanencia de las publicaciones efectuadas, puede tener el efecto de llevar a los jueces a conclusiones erróneas sobre la latitud que tienen para expresarse en las redes.

Las comisiones de disciplina judicial en varios estados de Estados Unidos de América que han considerado la permisibilidad de la participación de los jueces en las redes sociales la han avalado, con sus diferentes reservas sobre el asunto.[32] De las diferentes opiniones emitidas

---

[32] Véase Conn. Comm. on Judicial Ethics, Op. 2013-06, *disponible* *en* https://www.jud.ct.gov/committees/ethics/sum/2013-06.htm; Tenn. Judicial Ethics Comm., Op. 12-01, *disponible en* http://www.tncourts.gov/sites/default/files/docs/advisory opinion 12-01.pdf; Md. Judicial Ethics Comm., Op. 2012-07, *disponible* *en* http://www.courts.state.md.us/ethics/pdfs/2012-07.pdf; Okla. Judicial Ethics Advisory Panel, Op. 2011-3, *disponible* *en* http://www.oscn.net/applications/oscn/DeliverDocument.asp?

sobre el particular, nos parece más acertada la postura que asumió la Asociación de Jueces de California, que fue subsiguientemente citada por las comisiones de ética judicial de Maryland y Tennessee. Ésta dispuso que la conducta del juez en las redes sociales no debe violentar las disposiciones éticas aplicables y explicó que, en este contexto, aplican las mismas reglas que gobiernan la socialización y comunicación personal, independientemente del medio que se trate. Cal. Judges Association Ethics Comm., Op. 66, en la pág. 11 (2010); véase Md. Judicial Ethics Comm., Op. 2012-07 (2012); Tenn. Judicial Ethics Advisory Comm., Op. 2010-06 (2010). Así pues, el análisis sobre una presunta violación ética se debe basar en el contenido de la interacción que se llevó a cabo y no el medio de transmisión.

---

CiteID=464147; Mass. Jud. Ethics Comm., Op. No. 2011-6, *disponible en* http://www.mass.gov/courts/sjc/cje/2011-6n.html; Ethics Comm. of the Ky. Judiciary, Op. JE-119 (2010), *disponible en* http://www.courts.ky.gov/NR/rdonlyres/FA22C251-1987-4AD9-999B-A326794CD62E/0/JE119.pdf; Supreme Court of Ohio Board of Comm. on Grievances and Discipline, Op. 2010-7, *disponible en* http://www.supremecourt.ohio.gov/Boards/BOC/Advisory Opinions/2010/default.asp; Fla. Sup. Ct., Judicial Ethics Advisory Comm., Op. 2010-5, *disponible en* http://www.jud6.org/LegalCommunity/LegalPractice/opinions/jeacopinions/2010/2010-05.html; S.C. Advisory Comm. on Standards of Judicial Conduct, Op. 17-2009, *disponible en* http://www.judicial.state.sc.us/advisoryOpinions/displayadvopin.cfm?advOpinNo=17-2009; N.Y. Advisory Comm. on Judicial Ethics, Op. 08-176, *disponible en* www.nycourts.gov/ip/judicialethics/opinions/08-176.htm.

Hay múltiples ejemplos de casos disciplinarios suscitados por expresiones extrajudiciales por parte de jueces en las redes sociales. En todos, a los jueces se les ha amonestado por el contenido de su expresión y no por el método utilizado para transmitirla.

Así ocurrió en Tejas, durante una contienda electoral muy agitada para la posición de juez de paz en el Condado de Tarrant. La juez de la paz titular, al revalidar en la posición, decidió subir un mensaje a su página de *Facebook* que insultaba a su oponente derrotada mediante una profanidad de origen italiano. Tx. Comm. on Judicial Conduct, CJC No. 14-0651-JP (2015), *disponible en* http://www.scjc.texas.gov/media/8098/hon-jacquelyn-wright-14-0651-jp-public-warning-and-order-of-additional-education.pdf. En atención a ello, la Comisión Estatal sobre Conducta Judicial de Tejas concluyó que la publicación ofensiva en *Facebook* arrojaba dudas razonables sobre la imparcialidad de la juez de paz y "constituyó conducta intencional que resultó en el desprestigio público de la judicatura y la administración de la justicia". *Id.* en la pág. 4.

Asimismo, en Missouri, la Comisión de Jubilación, Remoción y Disciplina de los Jueces razonó que numerosas publicaciones de un juez desde su página oficial de *Facebook* que promocionaban actividades comunitarias de recaudación de fondos e invitaban al público en general a contribuir a ellas violaban los cánones de ética judicial

del estado, en tanto constituían un abuso del prestigio del oficio para promocionar los intereses personales y económicos de otros. *Mo. Comm. on Retirement, Removal, and Discipline*, Supreme Court No. SC95281 (2015), *disponible en* http://www.ncsc.org/~/media/Files/PDF/Topics/Center%20for%20Judicial%20Ethics/Prewitt%20MO.ashx. Igualmente, la Comisión lo encontró incurso de ser indebidamente crítico de la integridad de otros jueces y así fomentar la desconfianza del público en la judicatura al comentar en su página oficial de *Facebook* que "[a] diferencia de otros jueces, yo soy muy transparente sobre las decisiones que tomo en mis casos porque guardo mucho orgullo en el trabajo que hago". *Id.* en la pág. 3.

Más recientemente, en el estado de Nueva York, una juez comentó en su página de *Facebook* sobre un caso criminal pendiente contra un candidato para la asamblea municipal del pueblo de Morristown. State of New York Comm. on Judicial Conduct, *In the Matter of the Proceeding Pursuant to Section 44, subdivision 4, of the Judiciary Law in Relation to Lisa J. Whitmarsh* (2016), *disponible en* http://www.scjc.state.ny.us/Determinations/W/Whitmarsh.Lisa.J.2016.12.28.DET.pdf. Ésta publicó unas expresiones denunciando el proceso iniciado por la fiscalía como producto de corrupción y motivado por vendettas personales. *Id*. en la pág. 3. De igual manera, comentó que el candidato, David VanArnam, no tuvo intención criminal

alguna cuando declaró falsamente que había presenciado personalmente las firmas de unos endosos para su nominación. *Id*. Al amonestar a la juez de paz, quien no era abogada, la Comisión sobre Conducta Judicial de Nueva York consideró que sus expresiones "fueron inconsistentes con su deber de comportarse en todo momento de una manera que promueva la confianza pública en la integridad e imparcialidad de la judicatura". *Id*. en las págs. 8-9.

Como podemos ver, en los casos disciplinarios reseñados, si bien se discutieron los riesgos que presentan las redes sociales, lo que se amonestó en todos no fue la presencia de los jueces en las redes sociales, sino el contenido reprochable de sus expresiones en éstas. Ahora bien, establecido que el elemento principal a considerarse ante una presunta violación ética por expresiones extrajudiciales de un juez es el contenido de éstas y no el medio de transmisión, sí es menester atender unas áreas problemáticas que presentan las redes sociales, a saber: la publicidad, la interpretación de las modalidades expresivas en las redes sociales y la atribución de autoría de las publicaciones.

Sobre la publicidad, es menester apuntalar que los jueces deben considerar toda expresión compartida a su grupo de "amigos" o "seguidores" en las redes sociales como una hecha en público, sujeta a los estándares éticos que rigen la conducta pública de la judicatura. Esto, por varias razones. *Primero*, es casi imposible asegurar que

las expresiones compartidas entre seguidores del juez en las redes se quedarán entre sus seguidores y no podrán ser republicadas o compartidas por otra persona para llegar a una audiencia más amplia.[33] *Segundo*, porque aún si un comentario se queda entre el grupo de seguidores del juez, el número de seguidores que en promedio ostenta un usuario sería suficiente para considerarlo una expresión pública.[34] *Por último*, la permanencia de las expresiones efectuadas en las redes sociales, ya sea mediante la memoria del mismo sitio web o mediante la preservación de éstas por parte de otro usuario, permite que éstas resurjan públicamente ya cuando el usuario las creía desaparecidas.[35]

---

[33] ABA Comm. On Ethics & Prof'l Responsibility, Formal Op. 462 (2013), *disponible en* http://www.americanbar.org/dam/aba/administrative/professional_responsibility/formal_opinion_462.authcheckdam.pdf ("Judges must assume that comments posted to an [electronic social media] site will not remain within the circle of the judge's connections. . .[M]essages, videos, or photographs posted to [electronic social media] may be disseminated to thousands of people without the consent or knowledge of the original poster. Such data have long, perhaps permanent, digital lives such that statements may be recovered, circulated or printed years after being sent.").

[34] Véase PEW RESEARCH CENTER, *6 New Facts About Facebook*, 3 de febrero de 2014, *disponible en* http://www.pewresearch.org/fact-tank/2014/02/03/6-new-facts-about-facebook/.

[35] Ethics Comm. of the Ky. Judiciary, Op. JE-119 (2010), *disponible en* http://courts.ky.gov/commissionscommittees/JEC/JEC_Opinions/JE_119.pdf ("While social networking sites may have an aura of private, one-on-one conversation, they are much more public than offline conversations, and statements once made in that medium may never go away.").

En cuanto a la interpretación que se pueda hacer de las modalidades expresivas en las redes sociales, debemos reconocer que toda acción en las redes sociales tiene valor y significado expresivo. Nadie dudaría el valor expresivo de publicar unas expresiones en las redes sociales, o un comentario sobre las expresiones o imágenes compartidas por otro usuario. Pero, con relación a la opción de "Me gusta",[36] mediante el cual el usuario puede demostrar su interés en y posiblemente —pero no necesariamente— complacencia con una publicación, o de "Compartir" o "Retweet"[37] en *Facebook* y *Twitter*,

---

[36] Según la misma red social *Facebook*, oprimir "Me gusta" bajo una publicación es "una manera fácil de dejarle saber a las personas que disfrutas una publicación sin dejar un comentario". Facebook, *What does it mean to "Like" something?*, disponible en https://www.facebook.com/help/452446998120360 (traducción suplida). El profesor de Derecho Eugene Volokh también ha comentado que:

> A Facebook "like" is a means of conveying a message of support for the thing you're liking. That's the whole point of the "like" button; that's what people intend by clicking "like," and that's what viewers will perceive. . . I would treat "liking" as verbal expression — though it takes just one mouse-click, it publishes to the world text that says that you like something.

Eugene Volokh, *Is a "Like" Not "Substantive" Enough to "Warrant [ ] Constitutional Protection"?*, The Volokh Conspiracy, *disponible en* http://volokh.com/2012/04/29/is-a-facebook-like-not-substantive-enough-to-warrant-constitutional-protection/.

[37] Según *Twitter*, "[l]]a opción de Retweet de Twitter te ayuda a ti y a otros rápidamente compartir un Tweet con todos tus seguidores. Puedes darle Retweet a tus propios Tweets o a los Tweets de otra persona". Twitter, *FAQs about Retweets*, disponible en

respectivamente, mediante el cual el usuario disemina a sus seguidores el contenido publicado por otro usuario o página, el valor expresivo es más difícil de auscultar. Aunque bien el contenido expresivo de las susodichas acciones no es siempre manifiestamente discernible, sí debe quedar claro que son acciones llenas de contenido expresivo.

Como explicó un comentarista, utilizar la opción de "Me gusta" es una manera de transmitirle a un número amplio de seguidores en las redes sociales las creencias y opiniones personales del usuario transmisor, en tanto se demuestran en complacencia con la publicación sobre la cual oprimen "Me gusta". Ira P. Robbins, *What is the Meaning of "Like"?: The First Amendment Implications of Social-Media Expression*, 7 Fed. Cts. L. Rev. 127, 144 (2013). Aún si el mensaje transmitido no es claro y articulado, sí presenta alguna información sobre los pensamientos y creencias del transmisor. *Id.* en la pág. 146. De igual manera, la opción de "Compartir" o "Retweet" es un tipo de expresión, en tanto el transmisor intenta compartir un mensaje para que sea recibido por su público. Poco importa si el contenido de la expresión originó en el transmisor o no. *Id.* en las págs. 147-48. Así, al usuario seleccionar qué contenido compartir con sus seguidores, éste crea una asociación entre su persona y el contenido compartido. *Id.* Por lo tanto, dichas acciones revelan al

---

https://support.twitter.com/articles/77606        (traducción suplida).

receptor ciertos pensamientos del transmisor relacionados al contenido que se comparte, se gusta o recomienda. Así, un usuario no puede ampararse en el argumento de que el acto de compartir una publicación de otro es carente de valor expresivo.

Por último, con relación a la atribución de autoría de publicaciones en las redes sociales, consideramos que debe existir una presunción controvertible de que el dueño de la cuenta fue quien realizó la publicación o la acción en controversia. A menos que se presente prueba conducente a concluir que otra persona tomó control de la cuenta del usuario para realizar determinada acción, no debe haber razón para dudar que el usuario dueño de la cuenta es quien en efecto tuvo control de la cuenta y manejó sus acciones.

Atendidas las particularidades que presentan las redes sociales, reiteramos que el único elemento a considerarse en un proceso disciplinario contra un juez es si, en efecto, el contenido del mensaje que éste transmite violenta las disposiciones éticas aplicables a su oficio. Para ello, conviene repasar los *Cánones de Ética Judicial de 2005* y lo que éstos disponen sobre la conducta pública de los jueces.

**B.**

La toga que descansa sobre los hombros del jurista es un privilegio pesado. Le suma honores, mas le resta libertades. Al entrar en funciones, el magistrado toma,

por naturaleza de su ministerio, un voto de prudencia. No es coincidencia que la vocación de juez se ha descrito como "algo parecido al sacerdocio". *A. Ranjit Amerasinghe, Judicial Conduct, Ethics and Responsibilities* 1 (2002).

Aunque la membrecía en la judicatura no implica limitaciones absolutas sobre la expresión y la conducta, ésta sí impone serias restricciones sobre los derechos de expresión y asociación de los jueces. Véase *In re Hernández Torres*, 167 DPR 823, 839 (2006). Por lo tanto, "el juez tiene que ser *previsor* y examinar las posibles consecuencias de sus actos en términos de las impresiones que terceras personas podrían recibir de ellos". *Id*. en la pág. 848 (énfasis en el original). Así, se evita que comentarios desacertados, a veces imprudentes, de miembros de la judicatura mancillen la confianza de la ciudadanía en la integridad de sus servidores públicos.

Acorde esta responsabilidad prudencial, el Canon 23 de los *Cánones de Ética Judicial de 2005* recoge el estándar general que rige la conducta pública de los jueces. El mismo reza:

> Las juezas y los jueces se comportarán públicamente de manera que sus actuaciones no provoquen dudas sobre su capacidad para adjudicar imparcialmente las controversias judiciales, no deshonren el cargo judicial y no interfieran con el cabal desempeño de sus funciones judiciales. 4 L.P.R.A. Ap. IV-B, C. 23.

Este canon, de nueva cuña, se estatuyó por primera vez en los *Cánones de Ética Judicial de 2005*. Su creación

respondió a la necesidad de pautar una norma de conducta general para los jueces en su vida fuera del estrado, de modo que sus actividades extrajudiciales no afecten su labor judicial. *In re Aprobación Cánones de Ética Judicial de 2005*, 164 DPR 403, 445 (2005).[38]

El historial del Canon 23 revela que su redacción fue inspirada por el entonces Canon 4A del Código Modelo de Conducta Judicial de la Asociación Americana de Abogados (ABA, por sus siglas en inglés), ahora el Canon 3.1. *Id.*[39] El Canon 23, en lugar de hacer prohibiciones específicas, establece en el texto un estándar objetivo que rige una amplia gama de actuaciones. Sobre el particular, podemos observar que el requisito operativo del canon es que el comportamiento público del juez "no [provoque] dudas" sobre las cualidades indispensables de un juez. Por lo tanto, la vara de medición para auscultar una violación a este canon es si la conducta pública de un juez causaría que una persona razonable dude de la imparcialidad del juez o de su plena capacidad para desempeñar honradamente

---

[38] Con la inserción de este canon, se tornaron innecesarias otras prohibiciones más puntuales presentes en los *Cánones de Ética Judicial de 1977*, tales como la prohibición de asistir a lugares de dudosa reputación y la prohibición de ingerir bebidas alcohólicas inmoderadamente en sitios públicos. *In re Aprobación Cánones de Ética Judicial de 2005*, 164 DPR en la pág. 446.

[39] Véase Mark I. Harrison, *The 2007 ABA Model Code of Judicial Conduct: A Blueprint for a Generation of Judges*, 28 Justice Sys. J. 257, 264 (2007) ("To the extent that Rule 3.1 ("Extrajudicial Activities in General") serves as a general list of restrictions upon a judge's participation in extrajudicial activities, it is chiefly derived from Canon 4A of the 1990 Code.").

las funciones de su cargo.[40] Es una regla simple, que requiere únicamente de un ejercicio de prudencia por parte del juez.

En lo pertinente, el comentario oficial a la Regla 3.1 del Código Modelo de la ABA indica, usando el referido estándar objetivo, que las expresiones y actuaciones discriminatorias violarían el deber del juez de comportarse de una manera que no afecte su labor judicial:

> Discriminatory actions and expressions of bias or prejudice by a judge, even outside the judge's official or judicial actions, are likely to appear to a reasonable person to call into question the judge's integrity and impartiality. Examples include jokes or other remarks that demean individuals based upon their race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, or socioeconomic status. American Bar Association, *Comment on Rule 3.1*, *disponible en* http://www.americanbar.org/groups/professional_r esponsibility/publications/model_code_of_judicia l_conduct/model_code_of_judicial_conduct_canon_3 /rule3_1extrajudicialactivitiesingeneral/comment onrule3_1.html.

Ello no obstante, el Canon 23 no es el único que regula las expresiones y actuaciones públicas del juez, si bien es el más abarcador en ese ámbito. En lo pertinente, el Canon 2 requiere que los jueces ejemplifiquen la independencia judicial. 4 L.P.R.A. Ap. IV-B, C. 2. La independencia judicial ha sido reconocida como un derecho

---

[40] Sobre la Regla 3.1 del Código Modelo de Conducta Judicial de la ABA, se ha comentado que "[e]l estándar es uno objetivo: si la persona razonable entiende que cierto comentario afecta la parcialidad del juez, el mismo estará proscrito". Celeste Hilerio Echevarría, *Análisis sobre la libertad de expresión de los abogados y jueces de Puerto Rico*, 83 Rev. Jur. UPR 329, 363-64 (2014).

humano, consagrada en el Artículo 10 de la Declaración Universal de Derechos Humanos, que reza: "Toda persona tiene derecho, en condiciones de plena igualdad, a ser oída públicamente y con justicia por un tribunal independiente e imparcial". Asamblea General de las Naciones Unidas, *Declaración Universal de Derechos Humanos*, Art. 10 (1948).

Acorde con los *Principios de Bangalore sobre la Conducta Judicial* en los cuales se basa el Canon 2, la independencia judicial "presupone la total imparcialidad del juez. Cuando emite su fallo respecto de las partes, el juez debe estar libre de cualquier conexión, inclinación o predisposición que pueda afectar —o que pueda verse que afecta— a su capacidad de fallar independientemente". Oficina de las Naciones Unidas contra la Droga y el Delito, *Comentario relativo a los Principios de Bangalore sobre la conducta judicial* 40-41 (2013).[41] Sobre ello, este Tribunal ha expresado que "[e]l respeto y la confianza en la Judicatura que tenga la ciudadanía depende, de manera principalísima, de la conducta que observen los jueces; ellos, en el desempeño de sus funciones, deben ser laboriosos, prudentes y, sobre todo, imparciales". *In re Hernández Torres,* 167 DPR en la pág. 848 (énfasis suprimido).

---

[41] Véase *In re Aprobación Cánones de Ética Judicial de 2005*, 164 DPR en la pág. 411 ("Este nuevo canon proviene del concepto de independencia judicial comprendido en *Los Principios de Bangalore sobre la Conducta Judicial*").

El Canon 2, a su vez, está estrechamente relacionado al Canon 8, que regula la conducta de los jueces en su labor adjudicativa. En lo pertinente a esta discusión, el Canon 8 dispone que:

> [p]ara el cabal desempeño de sus funciones, las juezas y los jueces serán laboriosos, prudentes, serenos e imparciales. . . . .

> La conducta de las juezas y de los jueces ha de excluir la posible apariencia de que son susceptibles de actuar por influencias de personas, grupos, partidos políticos o instituciones religiosas, por el clamor público, por consideraciones de popularidad o notoriedad, o por motivaciones impropias. 4 L.P.R.A. Ap. IV-B, C. 8.

Así, este canon exige que los jueces prescindan de cualquier apariencia de influencias o motivaciones impropias que pueda viciar su labor adjudicativa. *In re Claverol Siaca*, 175 DPR 177, 190 (2009). Si bien el referido canon se relaciona con la labor adjudicativa del juez, hemos declarado anteriormente que sus preceptos son exigibles en las demás funciones del juez y en su comportamiento fuera de sala. *Id.* en la pág. 196-97.

Por último, entre las manifestaciones que más hondamente afectan la independencia judicial se encuentran los comentarios de índole política. Por ello, el Canon 28 obliga a los jueces a abstenerse de participar en el proceso político y de hacer comentarios públicos sobre asuntos de naturaleza político-partidista. En lo pertinente, éste indica que:

> Las juezas y los jueces se abstendrán de participar en el proceso político, sin menoscabo de su derecho al sufragio, a sus propias ideas

sobre cuestiones políticas y a los deberes y funciones que les asignan las leyes y los reglamentos electorales.
Sin que la siguiente enumeración excluya otras actividades, que por su carácter político les están vedadas, las juezas y los jueces no podrán:
. . . .
(e) hacer expresiones, comentarios o manifestaciones públicas sobre asuntos o actos de naturaleza político-partidista. 4 L.P.R.A. Ap. IV-B, C. 28.

Esto, ya que la apariencia de la independencia de criterio de los jueces se ve afectada en la medida en la cual éstos identifiquen su ideología política y exalten o critiquen unas figuras políticas u otras de modo que puedan inferirse que sus funciones pudieran ser afectadas por sus creencias políticas. Véase *In re Hernández Torres*, 167 DPR en la pág. 848.

Precisamente, se le apellidan a la legislatura y al ejecutivo las ramas políticas[42] porque la nuestra no lo es ni lo puede ser. Salvo que, a modo de excepción, la expresión de índole política se haga precisamente en defensa de la independencia judicial, los jueces deben abstenerse de hacer comentarios críticos políticos. *Id.* en la pág. 846. Cualquier manifestación de esa índole puede inculcar en los ciudadanos la noción siniestra de que, lejos de ser la única rama de gobierno imparcial, también estamos al servicio de intereses partidistas. Es un riesgo

---

[42] Véase, por ejemplo, *Torres Montalvo v. Gobernador*, 194 DPR 760, 774 (2016); *Córdova y otros v. Cámara de Representantes*, 171 DPR 789, 801 (2007); *Misión Ind. P.R. v. J.P.*, 146 DPR 64, 84 (1998); *Noriega v. Hernández Colón*, 135 DPR 406, 425-26 (1994); *Silva v. Hernández Agosto*, 118 DPR 45, 55 (1986).

inaceptable para nuestra democracia. Por dichas razones, las expresiones políticas por parte de los jueces son de las más perjudiciales para el principio de la independencia judicial.

### III.

También en aras de proteger el principio de imparcialidad en nuestro sistema de justicia, el Canon 30 -originalmente comprendido en conjunto con el Canon 31 en un solo canon- ilustra una de las salvaguardas principales de tal principio en actividades extrajudiciales: impedir el uso del prestigio del oficio judicial para ejercer influencia indebida sobre procesos judiciales o administrativos.

Específicamente, el Canon 30 de los *Cánones de Ética Judicial* prohíbe a los jueces cualquier conducta extrajudicial que:

> [D]é la impresión de que ejercen o pretenden ejercer influencia indebida en el descargo de las funciones judiciales de otros jueces y juezas, así como en la función ministerial de cualquier funcionario público.
>
> Tampoco influirán directa ni indirectamente en el ánimo de otros jueces y juezas para obtener un trato privilegiado al litigar causas personales. 4 L.P.R.A. Ap. IV-B, C. 30.

Como bien reluce del precitado canon, un juez no puede otorgar ni obtener tratos privilegiados en algún litigio. Ello es así, puesto que el cargo de juez en nuestra sociedad se ha significado como aquel que tiene el deber de enhebrar la justicia en cada pespunte de su

oficio. Los jueces están llamados a servir a todos por igual y a nadie en lo particular, desprendidos así de cualquier lealtad social, religiosa, política y económica. En miras de conservar la imparcialidad judicial, los jueces deben evitar cualquier mancha sobre la percepción que —a pesar de lo inocua y lo efímera de su aparición— puede dejar la imagen de una pretensión de influencia indebida sobre otros jueces o funcionarios públicos.

Respecto a la participación de los jueces en un procedimiento judicial o administrativo como testigo, suscita cierto recelo e impone un deber de mayor cautela. Las reservas sobre la permisibilidad de la comparecencia de un juez a un procedimiento adjudicativo deben circunscribirse a que su participación sea indispensable para adelantar la justicia. Tal limitación redunda, nuevamente, en el rol protagónico de autoridad y verdad con el cual se inviste un juez. No puede ser de otra forma, pues el oficio de magistrado:

> [E]s un cargo especial que proyecta una visión y noción pública destacada, de prestigio e influencia. Su opinión en y fuera del estrado, goza de una particular autoridad y respeto comunitario. En consecuencia, su testimonio en causas y trámites judiciales conlleva un gran valor persuasivo. En la medida en que una comparecencia e intervención como testigo de reputación pueda afectar el resultado de un dictamen judicial, el canon prohíbe de manera absoluta toda gestión voluntaria. Únicamente por excepción admite el testimonio judicial compelido. Así se intenta evitar exponer al juez que preside, en la difícil y angustiosa tarea de adjudicar credibilidad sobre otro juez, y a este último adoptar posiciones cuyo resultado pudiera afectar la imagen de la judicatura. *In re*

> *Comunicación Juez Pérez Giménez*, 112 DPR 683, 685-86 (1982).

Similarmente, el Canon 31 atiende las instancias en que un juez tiene en su haber el derecho de instar una reclamación ante un tribunal. Éste indica que para ejercer ese derecho, el juez debe estar representado por un abogado y no puede comparecer por iniciativa propia. 4 L.P.R.A. Ap. IV-B, C. 31. En *Bonilla v. Citibank*, -caso en el cual un juez del Tribunal de Distrito asumió su propia representación en un litigio de daños y perjuicios y cobro de dinero ante el Tribunal de Primera Instancia- hicimos constar nuestra insatisfacción respecto a las actuaciones del juez. Las razones que ofrecimos son ilustrativas:

> Los jueces debemos ser cautelosos cuando nos vemos obligados a ser parte en un pleito, especialmente de parte de quienes puedan interpretar que estamos tomando ventaja de nuestra posición. *Bonilla v. Citibank*, 116 DPR 705, 709 n.3 (1985).

Como fue señalado, la presencia de un juez en la silla testifical genera una atmósfera de tensión, pues, por una parte, un magistrado compañero tendrá que adjudicar credibilidad a ese testimonio y, por otra, algún abogado tendrá la incómoda tarea de realizarle un contrainterrogatorio.[43]

Fuera de la prohibición en el Canon 31 en contra de comparecencias de jueces como testigos de reputación, el

---

[43] Según el Model Code of Judicial Conduct (Model Code), "when a judge testifies as a witness, a lawyer who regularly appears before the judge may be placed in the awkward position of cross-examining the judge". Michael D. Wade, *The Judge as Witness*, 74 Mich. B.J. 906 (1995).

Código de Ética Judicial no contiene una prohibición sobre la comparecencia de un juez como testigo voluntario. Sin embargo, podemos intimar que en virtud del Canon 30, que impide que ejerzamos influencias indebidas sobre procesos judiciales y administrativos, y en atención a la presión natural que creará en el juzgador y la otra parte la participación de un juez como testigo, tal intervención no tiene cabida. Por ello hemos expresado, en cuanto al deber impuesto por el Canon 30, que "los jueces siempre deben ser conscientes de su deber de evitar hasta la apariencia de poseer influencia alguna sobre otros jueces o funcionarios, o de que éstos la tengan sobre ellos". *In re Claverol Siaca*, 175 DPR en la pág. 191.

Otro sería el caso si el juez se encuentra en la posición de ser un testigo necesario por razón de haber presenciado determinados hechos sin haber buscado participar activamente en el proceso, de manera que su participación en el juicio es accidental y no intencional. Empero, haciendo la salvedad de la necesidad adventicia del testimonio, de ordinario los jueces no deben testificar en procesos judiciales o administrativos ajenos —y mucho menos hacerlo por iniciativa propia— ya que ello acarrea el riesgo de ejercer una influencia que vicie el pleito al otorgar una ventaja indebida a la parte a favor de quien testifiquen.

**IV.**

Ya que uno de los elementos principales de todo juicio es la imparcialidad del juzgador, "[l]os tribunales de justicia tenemos el deber de velar por que la 'balanza' en que se pesan los derechos de todos nuestros ciudadanos está siempre libre de sospechas, aun cuando las mismas sean infundadas". *Sucn. Ortiz Ortiz v. Campoamor Redín*, 125 DPR 106, 109 (1990). Específicamente, en el desempeño de sus funciones adjudicativas, el Canon 8 establece la obligación de que la conducta de los jueces excluya la posible apariencia de que mediaron motivaciones impropias en su curso decisorio. 4 LPRA Ap. IV-B, C. 8. Por ello, tanto el Canon 20 de los *Cánones de Ética judicial* como la Regla 63 de las Reglas de Procedimiento Civil, 32 LPRA Ap. V, R. 63, proveen a los jueces con las herramientas necesarias para salvaguardar este principio cuando surjan circunstancias que puedan incidir en su imparcialidad. A manera de ejemplo, el Canon 20 de *Ética judicial* dispone que un juez está llamado a inhibirse:

> (a) Por tener prejuicio o parcialidad hacia cualesquiera de las personas, las abogadas o los abogados que intervengan en el pleito o por haber prejuzgado el caso.
> (b) Por tener interés personal o económico en el resultado del caso.
> . . . .
> (i) Por cualquier otra causa que pueda razonablemente arrojar dudas sobre su imparcialidad para adjudicar o que tienda a minar la confianza pública en el sistema de justicia. 4 LPRA Ap. IV-B, C. 20 (a), (b), (i).

Las precitadas disposiciones permiten que un juez, *motu proprio*, se inhiba. Ello es cónsono con los principios antes reseñados, pues "el juez no sólo debe ser imparcial, sino que también tiene que aparentarlo. Es decir, su conducta debe excluir toda apariencia de que es susceptibles de actuar a base de influencias de personas, grupos o partidos, o cualquier otra consideración o motivación impropia". *In re Ortiz Rivera*, 163 DPR 530, 535 (2004).

Nótese que en *Martí Soler v. Gallardo Álvarez* expresamos que el "Canon 20 de Ética Judicial ordena a los jueces que se inhiban en caso de perjuicio o parcialidad que les impida presidir un procedimiento judicial de la manera más justa, objetiva e imparcial". *Martí Soler v. Gallardo Álvarez*, 170 DPR 1, 8 (2007). Por tanto, cabe recalcar que este precepto normativo impone una directriz obligatoria. Reiteramos que "[a]l juez o a la jueza se le exige que responsablemente se inhiba oportunamente para proteger la legitimidad de sus actuaciones y la confianza de la ciudadanía en la Judicatura". *In re Acevedo Hernández*, 194 DPR 344, 367 (2015). Ello, pues se "requiere de los miembros de la Judicatura una conducta intachable que se caracterice por el más alto grado de imparcialidad e integridad y que responda a las normas que salvaguardan la independencia de su ministerio". *In re Grau Acosta*, 172 DPR 159, 164 (2007).

Necesariamente, que un juez incumpla con esta obligación, consciente del patente conflicto que lo impediría juzgar imparcialmente o que arrojaría serias dudas sobre su capacidad de así hacerlo, supone incurrir en conducta proscrita por el Canon 20 de los *Cánones de Ética Judicial*. En ese sentido, el mecanismo de la inhibición en nada se diferencia del mecanismo de descalificación del abogado, que como hemos establecido reiteradas veces, funge como una medida preventiva contra violaciones éticas por parte del letrado.[44] De la misma manera, el mecanismo de la inhibición opera para prevenir violaciones éticas por parte del juez, que mancillen no sólo su imagen como una figura imparcial al servicio del Derecho, sino también la imagen de la Rama Judicial entera.

## V.

El Canon 4 de Ética Judicial impone a todos los jueces el deber de cumplir con las obligaciones administrativas que surgen de las leyes y los reglamentos aplicables a la Rama Judicial. Asimismo, éstos tienen que cumplir diligentemente con las normas y órdenes

---

[44] Véase *Job Connection Center v. Sups. Econo*, 185 DPR 585, 596 (2012) ("[E]n muchas ocasiones las descalificaciones funcionan como una medida para evitar posibles violaciones a los cánones del Código de Ética Profesional"); *K-Mart Corp. v. Walgreens of P.R., Inc.*, 121 DPR 633, 637 (1988) ("Se reconoce como una medida preventiva para evitar posibles violaciones a los Cánones de Ética Profesional.").

administrativas que promueva la OAT. Véase 4 LPRA Ap. IV-
B, C. 4.

**A.**

Las *Reglas del Sistema de Personal de la Rama
Judicial*, 4 LPRA Ap. XII, rigen lo pertinente a la
administración y funcionamiento del personal de la Rama
Judicial. Por virtud de la Regla 26, este Tribunal aprobó,
el 30 de agosto de 1974, el *Reglamento de la
Administración del Sistema de Personal de la Rama
Judicial*, 4 LPRA Ap. XIII, que precisa los pormenores de
la jornada laboral de los empleados, incluyendo los jueces
del Tribunal de Primera Instancia. De otra parte, cabe
reseñar que, el 20 de noviembre de 2003, se notificó la
*Circular Núm. 10 para el Año Fiscal 2003-2004*, la cual
atiende todo lo relativo a las normas y procedimientos
relacionados con la asistencia y licencias del personal de
la Rama Judicial.[45]

En lo que nos concierne, la Sección VI de la *Circular
Núm. 10* delimita los pormenores sobre la jornada de
trabajo, asistencia y ausencias del empleado. Destacamos
que el inciso (A)(1) dispone -conforme al Artículo 18 del
*Reglamento*- que la jornada de trabajo diario consiste de
siete horas y media (7½), a ser completadas en un horario

---

[45] La Sección IV establece que "[e]stas normas y
procedimientos aplicarán a todo el personal de la Rama
Judicial, con la excepción del Juez Presidente(a) y los
Jueces y Juezas Asociados(as) del Tribunal Supremo".
*Circular Núm. 10 para el Año Fiscal 2003-2004,* pág. 1.

regular de 8:30 a.m. a 12:00 p.m. y de 1:00 p.m. a 5:00 p.m. [46] De otra parte, el inciso (B) de la precitada Sección regula lo relativo al registro, control y contabilización de la asistencia. De ahí se desprende que todos los jueces tienen el deber de registrar su asistencia, haciendo constar las horas de entrada y salida en la mañana y en la tarde. Asimismo, delega en quienes sean los supervisores designados la responsabilidad de realizar los cargos correspondientes, en ocasión de ausencias, a los diferentes tipos de licencias desglosadas en la Sección VII.

Por otro lado, el inciso (C) de la Sección VI de la *Circular Núm. 10* regula lo relativo a las ausencias. En particular, el sub inciso (2) le impone la obligación a todo empleado de la Rama Judicial de notificar cualquier ausencia, con anticipación, a su supervisor. Además, el sub inciso (5) dispone que los periodos cortos de ausencia se reportarán día por día y se realizarán los cargos a las licencias correspondientes. Y, por último, puntualizamos que el sub inciso (6) atiende las ausencias no autorizadas y las define como:

> aquellas en las cuales los empleados incurran y que a juicio del Supervisor(a) inmediato(a) se consideran sin causa justificada o cuando se

---

[46] Por otro lado, lo mismo surge de la Regla 12 (d) de las *Reglas de Administración del Tribunal de Primera Instancia*, 4 LPRA Ap. II-B, R.12 (d). Asimismo, se detalla en la Regla 12 (b) que las horas regulares de sesión serán de 9:00 a.m. a 12:00 p.m. y de 2:00 p.m. a 5:00 p.m. Claro está, las reglas disponen que estas sesiones pueden acortarse o extenderse según el procedimiento ahí establecido. 4 LPRA Ap. II-B, R.12 (b).

incurre en la ausencia sin previa autorización habiendo tenido la oportunidad para solicitarla o informarlo y no lo hizo. El(la) supervisor(a) le notificará la decisión al empleado. Esta ausencia debe notificarse en el Certificado de Ausencias Semanales como ausencia sin autorizar y se le descontará del sueldo del(la) empleado(a) . . . No se acumulará licencia por vacaciones ni por enfermedad durante el periodo de ausencia sin autorización. *Circular Núm. 10 para el Año Fiscal 2003*-2004, pág. 7.

Es preciso aclarar que, durante el año 2008, la Rama Judicial implementó un sistema automatizado para el registro de asistencia. El manejo de este sistema se realiza mediante la aplicación Kronos y se utiliza en conjunto con relojes biométricos y equipos de computadora para registrar el tiempo trabajado por el empleado. Véase *Memorando Núm. 17 para el Año Fiscal 2011-2012* de 22 de julio de 2011. Ciertamente, la implementación del referido sistema supuso un cambio en la forma en que se registraba y manejaba lo relativo a la asistencia. No obstante, ello no alteró las obligaciones que surgen del *Reglamento* y la *Circular Núm. 10*.

De otra parte, cabe destacar que no es la primera vez que este Tribunal atiende un procedimiento disciplinario relacionado a un miembro de la judicatura que protagoniza un mal manejo sobre su registro de asistencia. En *In re Miranda Rivera*, 141 DPR 94 (1996), examinamos la conducta de un juez que se ausentó durante tres (3) días laborables sin realizar la notificación anticipada a su supervisor ni ofrecer razones justificadas para así obrar. Además, el juez realizó por sí mismo los cargos a las licencias

correspondientes. Condenamos esta conducta tras concluir que se habían infringido los deberes consagrados en el Canon V de *Ética Judicial* de 1977 -antecesor del actual Canon 4 de *Ética Judicial* de 2005- y el *Reglamento de la Administración del Sistema de Personal*. En ese entonces, puntualizamos que, en caso de no poder cumplir con las horas regulares de sesión de los tribunales, un juez "*tiene* que, a la *brevedad* posible, dejárselo saber al Juez Administrador que le supervise. Es esa la única forma de hacer cumplir con nuestra política judicial de atender el calendario judicial sin demoras injustificadas y lograr, a su vez, una justicia rápida y eficiente". *In re Miranda Rivera*, 141 DPR en la pág. 98. De forma similar, en *In re Ferrán Quintana*, 157 DPR 622 (2002), sancionamos a un juez por haber hecho constar en los certificados de asistencia semanal que asistió a dos (2) jornadas laborales durante días en que éste se había ausentado.

**B.**

Mediante la *Circular Núm. 27 para el Año Fiscal 2006-2007*, se le informó a todos los empleados de la Rama Judicial que se implementarían las *Normas y procedimientos para el uso de equipos tecnológicos y acceso a los servicios que se ofrecen a través de la red de la Rama Judicial* de junio 2007. Estas disposiciones, que aplican a todo empleado que opere, sea usuario o supervise a empleados con equipo tecnológico asignado, dispone sobre el uso de éstos y de la red de la Rama Judicial. En lo que

nos concierne, la Sección VII regula lo pertinente a los servicios de correo electrónico. Específicamente, el inciso (A) (3) establece que todo empleado "es responsable por el uso y contenido de todo correo electrónico que envía, incluidas las imágenes y el sonido". Véase *Normas y procedimientos*, en la pág. 8. Por otro lado, el inciso (A) (4) indica que está prohibido utilizar la red para acceder o divulgar información que pueda considerarse ilegal, ofensiva, pornográfica u obscena.

De otra parte, la Sección VIII, la cual pauta las normas sobre el uso de los equipos tecnológicos y la red interna, dispone sin ambages que éstos sólo podrán ser utilizados para asuntos oficiales que persigan fines lícitos y responsables. Por otro lado, el inciso (S) específicamente dispone que "[n]o se utilizarán los equipos tecnológicos de la Rama ni los privados autorizados para enviar, recibir o crear mensajes o documentos de contenido discriminatorio por razones de raza, género, credo, ideas políticas u origen social o nacional o que puedan catalogarse como hostigamiento sexual". *Id*. en la pág. 18.

Posteriormente, en atención a la adquisición de nuevos equipos e implementación de nuevos programas de monitoreo, mediante la *Circular Núm. 17 para el Año Fiscal 2009-2010*, la Rama Judicial decidió reiterar las

disposiciones consignadas en las *Normas y procedimientos*.[47]

En lo pertinente, ahí se reiteró que:

> Está prohibido transmitir mensajes ofensivos o amenazantes; ver, cargar o bajar material político partidista, religioso o proselitista; ofrecer venta de servicios o productos o cualquier uso de índole lucrativo; ofrecer o solicitar sustancias cuya posesión es prohibida por ley; ver, transmitir, cargar o bajar material pornográfico o material que fomente violar las leyes relacionadas a la pornografía; bajar o transmitir material confidencial o material violando los derecho de autor, incluyendo imágenes, fotos, gráficas, dibujos, música o videos. Aunque el material no esté marcado con el símbolo de registrado, el usuario debe asumir que todo el material está protegido por las leyes de derechos de autor, a menos que se exprese de forma explícita el permiso para su uso. *Esta prohibición se extiende e incluye materiales, fotos, música, dibujos o videos con mensajes motivacionales, religiosos, artísticos, de propaganda, de moda o de cualquier otra índole. Circular Núm. 17 para el Año Fiscal 2009*-2010, págs. 3-4 (énfasis en el original).

## VI.

### A.

En primer lugar, atendemos los señalamientos relacionados al uso indebido de las redes sociales por parte del juez Mercado Santaella. Éste mantenía una cuenta en la red social *Facebook* cuyo carácter público permitía que cualquier persona pudiera acceder al contenido de sus expresiones ahí emitidas. En ésta, publicó o compartió un sinnúmero de expresiones reprochables en más de un ámbito.

---

[47] Surge del Informe que la *Circular Núm. 17 para el Año Fiscal 2009-2010* fue notificada al juez Mercado Santaella, vía correo electrónico, el 20 de mayo de 2010. Véase *Informe de la Comisión*, pág. 14.

*Primero*, en múltiples publicaciones colgadas en su página pública de *Facebook* aquí reseñadas, el Juez utilizó lenguaje a lo sumo vulgar al expresarse, y a menudo con el propósito de proferir un insulto a personas específicas. Si bien no nos compete monitorear el uso del lenguaje que haga un juez en sus conversaciones privadas, no podemos avalar que éste se exprese de una manera que no es digna de un miembro de la judicatura en declaraciones que gozan de un público amplio. Cada juez es un espejo en el cual se refleja la imagen de la judicatura. *Cf. In re Coll Pujols*, 102 DPR 313, 319 (1974). Al expresarse de manera soez pública y repetidamente, el juez Mercado Santaella le trajo deshonra al cargo judicial en violación al Canon 23.

*Segundo*, el Juez en dos ocasiones se fotografió con bebidas alcohólicas y subió las fotos a *Facebook* con texto acompañante. En la primera ocasión, se fotografió con lo que insinuaba el texto acompañante que era pitorro (ron clandestino de mayor por ciento de alcohol por volumen). En la segunda ocasión, subió una foto de sí mismo consumiendo champaña, implicó textualmente que pronto compraría otra botella y, en tono chusco, sugirió que tenía que moderarse para no embriagarse. Como hemos discutido, el texto del Canon 23 eliminó la necesidad de la disposición específica que existía en los cánones anteriores que prohibía el consumo inmoderado de bebidas alcohólicas en lugares públicos. Sin embargo, ello no significa que la prohibición cesó de existir; todo lo

contrario, permaneció, subsumida en la obligación impuesta por el Canon 23. Consideramos que el juez Mercado Santaella violó dicho canon al jactarse públicamente de su consumo de alcohol mediante la publicación de las referidas fotos.

*Tercero*, las publicaciones del juez Mercado Santaella revestían una latente —y en ocasiones patente— misoginia. Ello se evidenció en numerosas ocasiones. El Juez, en expresiones escritas y publicaciones compartidas, comentó sobre el sexo oral de una manera que presentaba —injuriosamente— a la mujer como un objeto sexual para la gratificación masculina. Así también, en más de una publicación, demostró que albergaba nociones preconcebidas sobre la proclividad de la mujer para la promiscuidad y el engaño a los hombres. Incluso, el juez Mercado Santaella consideró apropiado subir a *Facebook* una foto de su secretaria, empleada de esta Rama y bajo la supervisión suya, con un comentario sugestivo sobre su belleza física. De esta manera, el Juez le falló al deber impuesto por el Canon 8, a los fines de excluir la posible apariencia de ser susceptible a actuar por motivaciones impropias. Asimismo, el juez Mercado Santaella demostró precisamente el tipo de expresiones discriminatorias que según el comentario oficial a la Regla 3.1 de la ABA, llevarían a una persona razonable a dudar de la integridad e imparcialidad del Juez. Por lo tanto, con sus publicaciones humillantes hacia la mujer, violó el Canon

al comportarse públicamente de una manera que provocó dudas sobre su capacidad para actuar imparcial e íntegramente y deshonró el cargo judicial.

*Por último*, en numerosas ocasiones, el Juez le falló al principio de la independencia judicial, esencial para preservar la posición de la judicatura como una rama de gobierno ajena a intereses partidistas. Así, llegó a cuestionarse públicamente en una expresión en *Facebook* si la legislatura era el "enemigo" de la judicatura. Además, endosó públicamente a un candidato para la presidencia del Colegio de Abogados y Abogadas de Puerto Rico y le solicitó a todos los colegas abogados que lo "apreciaran", que votaran por su candidato predilecto. Asimismo, compartió una imagen del entonces Gobernador Hon. Alejandro García Padilla, en la cual se le acusaba a éste de mentir sobre varios asuntos de política pública. Finalmente, compartió una publicación donde, en un contexto jocoso, se le deseaba la muerte al entonces Gobernador Hon. Alejandro García Padilla y al entonces Presidente del Senado Hon. Eduardo Bhatia Gautier. Ello no provoca risa. Al contrario, el comportamiento público del Juez puso en tela de juicio su independencia de motivación política alguna. Cualquier persona razonable, al evaluar las actuaciones del Juez, consideraría socavada la confianza depositada en nuestro sistema de Justicia y en que sus operadores tomen sus determinaciones de acuerdo al Derecho y no a la política. Las expresiones de índole

política que nada tengan que ver con defender la independencia judicial están específicamente vedadas por los *Cánones de Ética Judicial*. Por estas razones, las publicaciones del Juez violaron los Cánones 2, 8, 23 y 28.

Cabe comentar que poco importa si algunas de estas expresiones fueron meramente compartidas por el Juez y no escritas de su propia mano. Al así compartirlas, fungió como transmisor del mensaje contenido en ellas a su público de seguidores. Poco importa si en ocasiones, como alega el Juez, su hijo también utilizó su cuenta. De algunas de las publicaciones aquí discutidas, se puede intimar que el autor no pudo ser nadie más que el juez Mercado Santaella. Por las demás, si bien alguna no fue de su autoría, fue crasamente irresponsable permitir que su hijo publicara algo que él mismo considerara reprochable en su página personal de *Facebook*, donde todo lo publicado aparenta ser de su autoría. De todas maneras, el Juez no presentó prueba alguna conducente a rebatir la presunción de que él fue el autor de todas las publicaciones. Asimismo, al momento de iniciar la investigación en su contra, todo el contenido de la página del juez Mercado Santaella era público, visible a cualquiera que deseara visitarla. Si bien los jueces deben presumir el carácter público de sus expresiones en las redes sociales, aquí la publicidad de éstas queda fuera de duda alguna. Por último, como detallamos, en varias de estas publicaciones, los seguidores del juez Mercado Santaella se refirieron a

él como "juez" u "honorable" en los comentarios. Es decir, sus seguidores estaban a lo sumo conscientes de que quien emitía estas expresiones públicas altamente reprochables era un miembro de la judicatura, llamado a enaltecer los valores que distinguen a nuestra rama de gobierno. La realidad es que ésta no es la primera ocasión que tenemos que disciplinar a un juez por sus expresiones en las redes sociales. *Véase In Re Colón Colón*, 2017 TSPR 49, 197 DPR ____ (2017). Esperamos que sea la última.

**B.**

El juez Mercado Santaella compareció como testigo en un procedimiento de revisión de pensiones alimenticias en el cual figuraba como demandante su sobrina, la señora Mercado Rodríguez. Una de las controversias a dilucidarse en el pleito era si el señor Perlloni ocultó una propiedad sita en la República Dominicana para que ésta no fuera incluida en el cómputo de las pensiones de los hijos habidos con la señora Mercado Rodríguez.

Durante la vista, el juez Mercado Santaella indicó que en su búsqueda de una propiedad cercana al mar, visitó un apartamento en el proyecto Cap Cana en la República Dominicana, el cual resultó ser propiedad del señor Perlloni. Asimismo, puntualizó que las fotografías que tomó a la propiedad en controversia tenían el único propósito de mostrárselo a su esposa quien no pudo acompañarlo.

Sin embargo, obra del expediente que días previos a que el juez Mercado Santaella viajara a la República Dominicana, la licenciada López Prieto –representante legal de la señora Mercado Rodríguez– le inquirió que fotografiara la alegada propiedad del señor Perlloni, puesto que las necesitaba para probar su existencia y valor.

Según los hechos antes expuestos, el juez Mercado Santaella participó activamente en la búsqueda de evidencia para adelantar las causas de su sobrina, gestiones que con toda probabilidad lo convertirían en testigo. Además, cabe señalar que dicha evidencia pudo haber sido obtenida por otros medios o autenticada por persona distinta que tuviera los conocimientos requeridos por las Reglas de Evidencia. Por lo tanto, el juez Mercado Santaella no era un testigo indispensable para adelantar la justicia. Por el contrario, éste provocó su propia citación como testigo al participar voluntariamente como ente investigador de la licenciada López Prieto. Tales actos sólo demuestran su falta de cautela y su participación activa en el pleito para beneficiar a su sobrina, atentando así contra la imparcialidad que debe imperar en todo procedimiento adjudicativo.

Asimismo, ya en el juicio, mediante la prestación de un testimonio inverosímil, el juez Mercado Santaella ocultó su conocimiento respecto a la titularidad del apartamento que fotografió y su intención previa de

colaborar en el caso de su sobrina. Las comunicaciones previas de la licenciada López Prieto dirigidas al Juez demuestran que éste viajó a la República Dominicana —al menos parcialmente— a tomar fotos para el caso de su sobrina. Así, el juez Mercado Santaella no sólo participó activamente en el litigio de su sobrina sin haber necesidad de ello, sino que también posteriormente encubrió las razones para su participación.

Como fue reseñado, la presencia de un juez en la silla testifical es una excepción, pues el rol que conlleva este oficio puede influenciar indebidamente un procedimiento judicial y, consecuentemente, socavar el principio de imparcialidad judicial. Es por ello que, con miras a evitar tales escenarios conflictivos o de aparente influencia indebida, el Canon 30 sanciona conductas como las del presente caso. Por todo lo antes discutido, el juez Mercado Santaella violó el Canon 30 del Código de Ética Judicial.

## C.

En cuanto a la intervención del juez Mercado Santaella como magistrado en ciertos procedimientos del caso *Pueblo de Puerto Rico v. Giovanni Perlloni*, no podemos sino demostrar nuestra desaprobación de las acciones del juez Mercado Santaella. Apenas un año y medio después de testificar en contra del señor Perlloni en el caso de su sobrina, el Juez aparentemente no encontró problema alguno con presidir unos procedimientos en el

caso penal del ex-esposo de su sobrina, sobre quien comentó que la considera como su hija.[48] Si bien su participación en el caso penal se circunscribió a asuntos de relativamente poca importancia, la inhibición es un asunto categórico. No le compete a un juez decidir si un asunto es de tan poca importancia que su parcialidad o apariencia de parcialidad no afectará su juicio al decidir. Lo único que debe evaluar el juez es si existe un prejuicio de su parte o la apariencia de prejuicio o parcialidad; si la respuesta es en la afirmativa, procede la inhibición, sin más. Por lo tanto, consciente de que el acusado en el caso era el ex-esposo de su sobrina, y que hace un año y medio había testificado contra él en un proceso civil, debió haber sido obvio para el juez Mercado Santaella su deber de inhibirse en el caso. Al evadir su deber claro ante esa situación de hechos, el juez violó el Canon 8 y el Canon 20 de los *Cánones de Ética Judicial*.

**D.**

El 17 de diciembre de 2010, el Juez Administrador, Sigfrido Steidel Figueroa, le notificó al juez Mercado Santaella un correo electrónico en el que le solicitó que revisara su registro de asistencia correspondiente a la semana del 6 al 10 de diciembre de 2010. Ese mismo día, el juez Mercado Santaella realizó una entrada manual en la aplicación Kronos con tal de hacer constar que el 9 de

---

[48] Véase *Informe de la Comisión*, págs. 16-17.

diciembre de 2010 su hora de entrada fue a las 8:30am y su hora de salida a las 5:00pm.[49]

No obstante, dicha entrada no reflejó la realidad de lo ocurrido ese día. A esos efectos, se desprende del *Informe de la Comisión* que el 9 de diciembre de 2010 el juez Mercado Santaella sólo presidió la Sala de Salinas desde las 9:51 a.m. hasta las 11:36 a.m.[50] Además, surge de los hechos probados que, ese mismo día, éste se trasladó a la República Dominicana. Así, pues, el 9 de diciembre de 2010, el juez Mercado Santaella no laboró una jornada completa, contrario a lo que hizo constar en su entrada manual en la aplicación Kronos. Por otro lado, quedó probado que el juez Mercado Santaella compareció, en calidad de testigo, a los procedimientos en el caso de su sobrina, el 20 de junio de 2011. No obstante, el 21 de junio de 2011, éste realizó una entrada manual en el sistema Kronos con tal de hacer constar que el 20 de junio de 2011 su hora de entrada fue a las 8:30am y su hora de salida a las 5:00pm.[51]

El juez Mercado Santaella arguyó que esta situación fue producto de un "mero error oficinesco". Además, sostuvo que tenía dificultades con el manejo de equipos electrónicos y que, para las fechas de los eventos en cuestión, tanto él como su secretaria continuaban

---

[49] Véase *Apéndice*, Querella AD-2014-7, Anejo 12, págs. 642-644.
[50] Véase *Apéndice*, Querella AD-2014-7, Anejo 15, en la pág. 649.
[51] Véase *Apéndice*, Querella AD-2014-7, Anejo 12, págs. 645-648.

aprendiendo a manejar la aplicación Kronos. Esto no nos convence.

Según indicamos, conforme lo dispone el Canon 4, todo juez tiene el deber de cumplir diligentemente con sus deberes administrativos y con los reglamentos aplicables a la Rama Judicial. No cabe dudas que tanto el *Reglamento de la Administración del Sistema de Personal* como la *Circular Núm. 10* disponen -con lujo de detalle- la forma en que se realizará el registro de asistencia y cómo se atenderán las notificaciones de ausencia y el cargo a las licencias correspondientes. La conducta desplegada por el juez Mercado Santaella respecto a cómo manejó su registro de asistencias para los días 9 de diciembre de 2010 y 20 de junio de 2011, se aparta totalmente de las directrices que tenía la obligación de acatar.

A esos efectos, el juez Mercado Santaella incumplió con su deber de notificar su ausencia parcial para el 9 de diciembre de 2010 y su ausencia de jornada completa para el 20 de junio de 2011. Es evidente que éste tenía conocimiento del proceso a seguir, pues surge del *Informe de la Comisión* que el 6 de diciembre de 2010 dirigió una comunicación al Juez Administrador informando su ausencia para el 10 de diciembre de 2010.[52] Asimismo, se desprende del *Informe* que el juez Mercado Santaella, como mínimo, desde el mes de abril de 2010, estaba encargado de realizar ajustes en el registro de asistencia de otros

---

[52] Véase *Informe de la Comisión*, pág. 33.

empleados mediante la aplicación Kronos. Resulta lógico concluir que éste tenía conocimiento de cómo se utilizaba la aplicación y, por consiguiente, la necesidad de cargar las ausencias a las licencias correspondientes. Efectivamente, al no cargar los días ausentados a una licencia, el Juez cobró un salario —ilegalmente— por labor que no efectuó.

Según hemos expresado en el pasado, la actuación del juez Mercado Santaella respecto a este particular constituye un atentado contra el funcionamiento de la Rama Judicial. Así, "con su comportamiento al mentir conscientemente en unos documentos administrativos y cobrar fondos públicos sin haber rendido la labor correspondiente, exhibió una conducta carente de valores morales que es contraria al honor de la Judicatura y que proyecta una imagen distorsionada de lo que debe ser un buen administrador de justicia". *In re Ferrán Quintana*, 157 DPR en las págs. 633-634. Ciertamente, cobrar por un trabajo que uno no hizo sería reprochable donde sea; en un gobierno que atraviesa una grave crisis fiscal, esta ilegalidad cobra especial oprobio. Por todo lo anterior, consideramos que el juez Mercado Santaella violó el Canon 4 de los *Cánones de Ética Judicial*.

**E.**

Por último, atendemos los cargos presentados en la Querella AD-2015-4. Surge del *Informe de la Comisión* que el juez Mercado Santaella aceptó, en primer lugar, que los

correos electrónicos en cuestión fueron enviados desde su

correo electrónico de la Rama Judicial. Asimismo,

reconoció que el haberlos enviado fue un "terrible error".

Ahora bien, planteó que, por motivo de los referidos

mensajes, la Directora Administrativa suspendió

temporalmente su uso del correo electrónico. Además,

indicó que, el 25 de enero de 2012, sostuvo una reunión

con la Directora Administrativa en la que ésta le

"explicó, orientó y amonestó verbalmente sobre el uso del

correo electrónico". *Informe de la Comisión*, pág. 19.

En consideración a esas alegaciones, en su *Memorando*

*de Derecho*, el juez Mercado Santaella planteó dos (2)

preguntas, a saber:

> *Primero*: ¿puede ahora la actual Directora
> promover la querella AD-2015-5, cuando ya la
> Directora anterior había amonestado al Juez
> Mercado Santaella y había dado por concluido el
> asunto? *Segundo*: ¿Es cónsono con el debido
> proceso de ley, promover una querella en contra
> del Juez Mercado Santaella -la cual se presentó
> el 23 de octubre de 2015- por enviar unos
> mensajes de correo electrónico remitidos del 8
> de noviembre al 6 de diciembre de 2010; es decir
> aproximadamente cuatro (4) años, diez (10) meses
> y diecisiete (17) días; y luego de que la
> Directora anterior lo hubiera sancionado
> verbalmente? *Informe de la Comisión*, pág. 38
> (énfasis en el original).[53]

---

[53] Consideramos que el segundo planteamiento del juez Mercado Santaella es inmeritorio y no amerita discusión ulterior. Nótese que la Regla 3 del *Reglamento de disciplina judicial*, según enmendado, establece que estas disposiciones aplican, incluso, a procedimientos disciplinarios contra jueces que "trate de hechos tan remotos que impida realizar una investigación efectiva o que coloque al juez o jueza en una situación de indefensión". *In re Enmiendas a las Reglas de Disciplina Judicial*, 191 DPR 564, 567 (2014). Tras un examen del expediente y la reglamentación aplicable, no encontramos

Por ende, como cuestión de umbral, el juez Mercado Santaella arguyó que la OAT no podía promover una nueva "sanción", pues la doctrina de cosa juzgada, en su vertiente intra-agencial, así lo impedía. La Comisión de Disciplina Judicial consideró que este planteamiento era meritorio. En esencia, razonó que las *Normas y procedimientos para el uso de equipos tecnológicos y acceso a los servicios que se ofrecen a través de la red de la Rama Judicial* establecen la posibilidad de imponer sanciones disciplinarias.[54] Así pues, tras haberse amonestado verbalmente al juez Mercado Santaella, en consideración a los mismos correos electrónicos en que se fundamenta la querella AD-2015-4, era de aplicación la doctrina de cosa juzgada. Ello, independientemente de que en esta ocasión la conducta se examinara bajo el crisol diferente de la ética judicial. En consideración a lo anterior, la Comisión recomendó el archivo de la querella.

---

impedimento alguno para que se hubiese promovido el procedimiento en cuestión.

[54] En particular, el inciso (C) de la Sección IX de las *Normas y Procedimientos* establece que "[e]l uso indebido del Sistema y la violación a las Normas y Procedimientos podría resultar en una investigación administrativa o criminal y en la imposición de las medidas disciplinarias civiles o criminales correspondientes". *Normas y Procedimientos*, pág. 19. Además, cabe destacar que el inciso (G) establece que "[l]a violación de estas normas podría conllevar la imposición de aquellas medidas disciplinarias que dispone el *Reglamento para la Administración del Sistema de Personal de la Rama Judicial*, aprobado el 30 de agosto de 1974, según enmendado, dependiendo de la naturaleza y la magnitud de la violación o negligencia incurrida". *Id*. en la pág. 20.

A la luz de los hechos de este caso, consideramos que la doctrina de cosa juzgada, en su vertiente intra-agencial, no es aplicable. En primer lugar, si bien hemos resuelto que la doctrina aplica en procedimientos administrativos dentro de la misma agencia, figura como supuesto necesario para emplear la doctrina de cosa juzgada la existencia de una determinación final y firme producto de un proceso judicial o administrativo iniciado y culminado.[55] Como veremos, el juez Mercado Santaella nunca fue sujetado a un procedimiento disciplinario formal que ameritara las protecciones conferidas por la doctrina de cosa juzgada.

Según reseñamos, el incumplimiento con las disposiciones contenidas en las *Normas y Procedimientos* pueden dar paso a la imposición de medidas disciplinarias. Ahora bien, la manera en que se realiza esta imposición

---

[55] Sobre la aplicación de la doctrina a procesos administrativos, véase *Pagán Hernández v. UPR*, 107 DPR 720 (1978). Sobre el requisito de la determinación final y firme, véase *S.L.G. Szendrey-Ramos v. Consejo de Titulares*, 184 DPR 133, 156 (2011); *Worldwide Food Dis., Inc. v. Colón et al.*, 133 DPR 827, 833-34 (1993); *Bolker v. Tribunal Superior y Sosa, interventores*, 82 DPR 816, 824 (1961); véase además la jurisprudencia del Primer Circuito Federal que discute nuestra doctrina de cosa juzgada, *Cruz v. Melecio*, 204 F.3d 14, 20 (1st Cir. 2000); *Felix Davis v. Vieques Air Link*, 892 F.2d 1122, 1125 (1st Cir. 1990). Nótese que una sentencia o resolución es final una vez se archiva en autos su notificación. R. Hernández Colón, *Práctica jurídica de Puerto Rico: derecho procesal civil* 378 (5ta ed., 2010). Por otro lado, ésta adviene firme una vez transcurra el término para apelar el dictamen. Aunque nuestras expresiones sobre el requisito de la sentencia final y firme se han producido en el contexto de procesos judiciales, consideramos que este requisito es igualmente exigible en el contexto administrativo en cuanto a las determinaciones ahí emitidas.

tiene que guardar consonancia con el tipo de puesto que ostenta el empleado sancionado. El Artículo 16 del *Reglamento para la Administración del Sistema de Personal de la Rama Judicial* dispone sobre las medidas disciplinarias que pueden ser impuestas a ciertos empleados de la Rama Judicial y establece el procedimiento a seguir para imponer algunas de ellas. En lo que nos concierne, el Artículo 16.3 (a) contempla la amonestación verbal o escrita -que no se hace constar en el récord individual del empleado- como una acción disciplinaria menor. Ahora bien, este Artículo sólo contempla los procedimientos correspondientes a la imposición de acciones disciplinarias menores para alguaciles, secretarios de corte y otros funcionarios o empleados de sala. Véase *Reglamento*, pág. 33. Por tanto, ya que el Reglamento no regula particularmente la imposición de sanciones a los jueces del Tribunal de Primera Instancia o el Tribunal de Apelaciones, es preciso recurrir al *Reglamento de disciplina judicial*.

Por otro lado, al momento de los hechos, la Regla 3 del *Reglamento de disciplina judicial* disponía que estas reglas regirían los procedimientos disciplinarios para jueces del tribunal de instancia y del foro apelativo intermedio, en lo pertinente, por "violación a la ley, a los Cánones de Ética Judicial, al Código de Ética Profesional, *a las órdenes y a las normas administrativas aplicables*, o por negligencia crasa, inhabilidad o

incompetencia profesional manifiesta en sus deberes judiciales". *In re: para aprobar las Reglas de disciplina judicial y derogar las reglas de procedimiento para acciones disciplinarias y de separación del servicio por razón de salud de jueces o juezas del Tribunal de Primera Instancia y del Tribunal de Circuito de Apelaciones de Puerto Rico*, 164 DPR 137, 138-139 (2005) (énfasis suplido). Cabe destacar que, dicho reglamento –además– contemplaba un procedimiento detallado para regular la presentación de la queja, la etapa investigativa y la etapa adjudicativa del proceso disciplinario.

Si bien es cierto que del *Informe de la Comisión* surge como hecho no controvertido que el juez Mercado Santaella sostuvo una reunión con la Directora Administrativa y ahí se le amonestó verbalmente, no hay evidencia acreditativa de que ello figurase como el resultado de un proceso administrativo disciplinario al amparo de las *Reglas de disciplina judicial*. Más bien, este proceso comenzó el 4 de septiembre de 2015, cuando la Directora Administrativa de los tribunales –al amparo de la Regla 5(c) de las *Reglas de disciplina judicial*, según enmendadas– ordenó el comienzo de la investigación sobre la conducta y posible violación por el juez Mercado Santaella de los *Cánones de Ética Judicial* al haber enviado los referidos correos electrónicos. En consideración a lo anterior, y ya que estamos facultados para adoptar, modificar o rechazar, en todo o en parte, el

informe presentado por la Comisión de Disciplina Judicial, descartamos la recomendación de archivar la queja AD-2015-4. Véase *In re Maldonado Torres*, 152 DPR 858 (2000).

Cabe destacar que el 2 de diciembre de 2009, el juez Mercado Santaella suscribió una *Certificación del (de la) usuario(a) para usar los equipos tecnológicos y los accesos a los sistemas de la Rama Judicial* (OAT-1215-A (Rev. Junio 2007)). Al así hacerlo éste certificó que utilizaría el equipo tecnológico y el uso de la red de conformidad con las normas y procedimientos. Asimismo, y en particular, garantizó que no realizaría transacciones o acciones "a través de la Red que puedan considerarse ofensivas, obscenas o abusivas; que violenten disposiciones legales, de política pública, reglamentos o normas de la Rama Judicial". Ciertamente, al cumplimentar la referida *Certificación*, el juez Mercado Santaella se comprometió en cumplir con las *Normas y Procedimientos* en toda su extensión.

A pesar de ello, entre el 14 de octubre de 2010 y el 26 de mayo de 2011, el juez Mercado Santaella envió y reenvió, desde su correo electrónico de la Rama Judicial, veintisiete (27) correos electrónicos a empleados e individuos externos. Según detallamos anteriormente, estos correos electrónicos evidencian contenido con alto contenido sexista, misógino, sexual, político, religioso y discriminatorio. En definitiva, los correos electrónicos que envió y renvió el juez Mercado Santaella distan del

respeto y decoro que debe observar un miembro de la judicatura. Por lo tanto, éste quebrantó los postulados normativos que está llamado a acatar y obró en contra de la preservación de los valores éticos y morales que la Rama Judicial defiende y ejemplifica. Al así hacerlo, violentó los Cánones 2, 4, 8, 23 y 28.

**VII.**

Varias expresiones del juez Mercado Santaella, despectivas hacia la mujer, serían perturbadoras aunque éste no fuera juez. Ciertamente, son un reflejo de una sociedad a la cual todavía le resta demasiado por entender que una mujer no es un objeto, que no es un molde donde proyectar prejuicios, que no es una figura inocente y frágil ni tampoco una fuente de engaño y seducción, sino una ser humano, tan compleja y acreedora de sus libertades —y de su latitud para definirse— como cualquier otra persona.

Asimismo, en cualquier otro lugar de empleo, registrar días como trabajados que no lo fueron se consideraría un robo al patrono y justa causa para un despido. No se puede ser menos severo en el gobierno, donde nuestro patrono es el pueblo que se despierta todos los días a trabajar y, con mucho sacrificio, paga con sus contribuciones los servicios esenciales que rendimos.

En fin, si los jueces están llamados a cumplir con unos estándares de conducta más exigentes por naturaleza de su ministerio, pues lo mínimo que pueden hacer es

cumplir con el nivel de decencia básica que se desea de toda persona.

Por las razones aquí expuestas, concluimos que el juez Mercado Santaella violó los Cánones 2, 4, 8, 20, 23, 28 y 30. En consideración a la gravedad de sus transgresiones y la multiplicidad de situaciones fácticas en las cuales incumplió con sus deberes éticos, decretamos la separación inmediata del Hon. César Mercado Santaella del cargo de Juez Superior.

Se dictará Sentencia de conformidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

Hon. César Mercado Santaella       **Núm.** AD-2014-7
Juez Superior                              AD-2015-4

SENTENCIA

San Juan, Puerto Rico, a 26 de abril de 2017

Por las razones expuestas en la Opinión *Per Curiam* que antecede, concluimos que el juez Mercado Santaella violó los Cánones 2, 4, 8, 20, 23, 28 y 30. En consideración a la gravedad de sus transgresiones y la multiplicidad de situaciones fácticas en las cuales incumplió con sus deberes éticos, decretamos la separación inmediata del Hon. César Mercado Santaella del cargo de Juez Superior.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. La Jueza Presidenta Oronoz Rodríguez no intervino. La Jueza Asociada señora Pabón Charneco y el Juez Asociado señor Rivera García no intervienen.

Juan Ernesto Dávila Rivera
Secretario del Tribunal Supremo